# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

JOHNETTA RILEY,
on Behalf of Herself and All Others
Similarly Situated,

          Plaintiff,

          vs.

BMO HARRIS BANK, N.A.,
FIRST PREMIER BANK, a South
Dakota State-Chartered Bank, and
MISSOURI BANK AND TRUST,
a Missouri State-Chartered Bank.

          Defendants.

**CASE NO. 13-CV-1677**

**CLASS ACTION COMPLAINT**

**RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT**

**JURY TRIAL DEMANDED**

Plaintiff, Johnetta Riley, individually and on behalf of the Class described

below, by her attorneys, makes the following allegations based upon information

and belief, except as to allegations specifically pertaining to Plaintiff and her

counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1. Plaintiff brings this class action against Defendants BMO Harris Bank,

N.A. ("BMO"),  First Premier Bank ("First Premier"), and Missouri Bank and

Trust ("MBT") (collectively "Defendants") to recover damages and other relief

available at law and in equity on behalf of herself as well as on behalf of members of the class who have been injured by Defendants' participation in a scheme to access and utilize the Automated Clearing House ("ACH") network to collect unlawful debts in violation of 18 U.S.C. § 1962 and the law of numerous states, including the District of Columbia.

2.     This is a civil action seeking monetary damages, restitution, and declaratory and injunctive relief from Defendants, arising from their participation in schemes to collect on "payday loans" in states that have made payday loans unlawful.

3.     Payday loans—small, closed-end loans due in full on the borrower's next "payday"—have a long and sordid history.  For years, unscrupulous lenders have taken advantage of desperate borrowers who are unable to obtain funds anywhere else in order to make ends meet, by offering loans at usurious and unconscionable rates.  Payday lenders operate on the shadowy fringe of the mainstream financial system.

4.     At least thirteen states across the nation and the District of Columbia have either banned payday loans directly or effectively banned them by operation of an interest rate cap.  Payday loans are illegal in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio,

Pennsylvania, Vermont, and West Virginia (the "banned states"), and the District of Columbia.

5.     The District of Columbia wholly bans payday loans.  D.C. Code § 26-319.

6.     In addition, the District's usury law also works to bar payday loans: "the parties to an instrument in writing for the payment of money at a future time may contract therein for the payment of interest on the principal amount thereof at a rate not exceeding 24% per annum."  D.C. Code § 28-3301.  "Interest" includes "any compensation directly or indirectly imposed by a lender for the extension of credit for the use or forbearance of money, including any loan fee, origination fee, service and carrying charge, [and] investigator's fee[.]"  D.C. Code § 28-3311.

7.     D.C. law further provides that: "In an action upon a contract for the payment of money with interest at a rate forbidden by law, any payment of interest that may have been made on account of the contract is deemed to be payment made on account of the principal debt."  D.C. Code § 28-3305.

8.     Certain payday lenders—many based offshore or purportedly on Indian reservations—make use of the Internet to circumvent these prohibitions and offer payday loans to consumers residing in these states while ignoring the laws prohibiting those very loans (the "Illegal Online Payday Lenders").  These loans ("Illegal Online Payday Loans") feature interest rates of 400%, 500%, and higher.

9.     Illegal Online Payday Lenders' ability to defy state and D.C. law rests on the cooperation of financial institutions like Defendants that knowingly "originate" illicit payday loan debits and credits in the mainstream electronic payments system (the "Automatic Clearing House" or "ACH Network").  These banks, known as Originating Depository Financial Institutions ("ODFIs") act as middlemen between illicit Illegal Online Payday Lenders (many based offshore) and the mainstream electronic payments system.

10.     Indeed, it would be impossible for Illegal Online Payday Lenders to deposit payday loan proceeds or debit payday loan payments from customers' bank accounts in states where the loans are illegal and unenforceable without Defendants' willingness to allow the Illegal Online Payday Lenders to access the ACH Network.

11.     BMO, First Premier, and MBT, acting as ODFIs, actively participate in this unlawful scheme by working on behalf of Illegal Online Payday Lenders to "originate" ACH entries that represent payday loan credits and debits to and from consumer checking accounts, thereby enforcing debts they know to be unlawful.

12.     Defendants know that they are crediting and debiting consumers' accounts for unlawful purposes because they know they are acting on behalf of Illegal Online Payday Lenders and that the entries they originate on the ACH Network on behalf of such Illegal Online Payday Lenders will credit or debit funds

in states in which the Illegal Online Payday Lenders' loans are illegal and unenforceable.  Defendants are required by federal banking regulations and the rules of the ACH Network to know the identities of the entities for which they originate transactions and to assure themselves that such transactions do not violate state or federal law.

13.    Defendants' illegal schemes with Illegal Online Payday Lenders have victimized Plaintiff and millions of others.  Unless enjoined, Defendants will continue to engage in these schemes and cause substantial injury to consumers.

## PARTIES

14.    Plaintiff is a citizen and resident of Washington, District of Columbia.

15.    Defendant BMO is a national banking association incorporated in the State of Delaware with main offices at 111 West Monroe Street, Chicago, Illinois.

16.    Defendant First Premier is a South Dakota state-chartered bank with main offices at 601 South Minnesota Avenue, Sioux Falls, South Dakota.

17.    Defendant MBT is a Missouri state-chartered bank with main offices at 1044 Main Street Kansas City, Missouri.

## OTHER PERSONS AND ENTITIES

18.    The "Illegal Online Payday Lenders" include, but are not limited to, the following:

a.      Cash Jar is an entity located in Belize City, Belize C.A. and maintains a website with an associated domain name of **www.cashjar.com** for the purpose of making illegal online Payday Loans.  At all times relevant hereto, Cash Jar engaged in the practice of making and did make illegal payday loans to persons residing in the banned states and the District of Columbia where such loans are prohibited outright.  Cash Jar is in the business of making and collecting "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans that it makes and collects from borrowers are:

   i.   unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury;

   ii.  incurred in connection with the business of lending money at a rate usurious under State or Federal law; and

   iii. the usurious rate was at least twice the enforceable rate.

b.      SWB Funding maintains a website with an associated domain name of **www.swbfunding.com** for the purpose of making illegal online Payday Loans.  At all times relevant hereto, SWB Funding engaged in the practice of making and did make illegal payday loans to persons residing in the banned states and the District of Columbia where such loans are prohibited outright.  SWB Funding is in the business of making and

collecting "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans that it makes and collects from borrowers are:

    i.   unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury;

    ii.   incurred in connection with the business of lending money at a rate usurious under State or Federal law; and

    iii.   the usurious rate was at least twice the enforceable rate.

## JURISDICTION AND VENUE

19.    Plaintiff brings this action pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1964(c) and (d), which confers jurisdiction upon this Court over the subject matter of this action. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court in a civil action arising under federal law. This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

20.    Alternatively, this Court has jurisdiction under 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because this lawsuit has been brought as a class action, the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and one or more of the members of the putative Classes are residents of a different state than Defendants.

21.     This Court has personal jurisdiction over every Defendant pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1965.

22.     Alternatively, this Court also has personal jurisdiction over BMO pursuant to D.C. Code § 13-423 in that Plaintiff's claims arise from BMO directly or by an agent causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia and from which BMO derives substantial revenue from services rendered in the District of Columbia.

23.     Alternatively, this Court also has personal jurisdiction over First Premier pursuant to D.C. Code § 13-423 in that Plaintiff's claims arise from First Premier directly or by an agent causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia and from which First Premier derives substantial revenue from services rendered in the District of Columbia.

24.     Alternatively, this Court also has personal jurisdiction over MBT pursuant to D.C. Code § 13-423 in that Plaintiff's claims arise from MBT directly or by an agent causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia and from which MBT derives substantial revenue from services rendered in the District of Columbia.

25.     Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to

Plaintiff's claims occurred here and because BMO, First Premier, and MBT are

subject to personal jurisdiction here.

## BACKGROUND FACTS
### Payday Loans

26.    A payday loan is a short-term (typically a matter of weeks) high fee,

closed-end loan, traditionally made to consumers to provide funds in anticipation of

an upcoming paycheck.  A borrower obtaining a payday loan must either provide a

personal check to the lender or an authorization to electronically debit the

borrower's deposit account for the loan amount and associated fee as security for

the loan.  If the borrower does not repay the loan or make arrangements to extend

the loan, the lender can deposit the borrower's check or initiate an electronic

withdrawal from the borrower's deposit account.

27.    Payday loans target the most vulnerable and desperate of borrowers,

who might not qualify for a conventional unsecured loan or who are in such

desperate need of cash that they cannot wait for the formal approval process that a

conventional unsecured loan requires.

28.    Payday loans feature exorbitant annual interest rates (sometimes

misleadingly referred to as "fees") and require "balloon" repayments shortly after

the loan is made.

29.    If a borrower is unable to repay the full amount of the loan on the due

date, the lender typically gives the borrower the option to "roll over" the loan

balance by paying another "fee," usually equal to the initial interest payment at the time of loan funding.  The cycle then continues until such time as the borrower is either able to pay off the loan in full or the borrower defaults on the loan.

30.     Many borrowers repeatedly roll over or take out additional payday loans, often on the same day as a previous one is repaid.  Over 75 percent of payday loan volume is the result of "churn"—borrowers having to take out additional loans to pay off the original debt.

31.     For these and other reasons, the District of Columbia, along with thirteen states, has outlawed payday loans, as discussed above.

32.     Illegal Online Payday Lenders, while not permitted to operate in the banned states and the District of Columbia, have simply moved to the Internet in order to solicit desperate borrowers in the banned states and the District of Columbia into illegal loans using an online application process.

33.     Illegal Online Payday Lenders' evasion of state and D.C. law could not have been accomplished without the complicity of Defendants who provide Illegal Online Payday Lenders with access to the ACH Network.

**The ACH Network**

34.   The ACH Network is a processing system in which financial institutions accumulate ACH transactions throughout the day for later batch processing.  Instead of using paper to carry necessary transaction information, such

as with checks, ACH Network transactions are transmitted electronically, allowing
for faster processing times and cost savings.

35.    The ACH Network processes two types of transactions:  Direct
Deposits via ACH and Direct Payments via ACH.  "Direct Deposit" via ACH is
the deposit of funds for payroll, employee expense reimbursement, government
benefits, tax and other refunds, and annuities and interest payments.  It includes
any ACH credit payment from a business or government to a consumer.

36.    "Direct Payment" is the use of funds to make a payment via ACH.
Individuals or organizations can make a Direct Payment via ACH as either an
ACH credit or ACH debit.  A Direct Payment processed as an ACH credit puts
funds into an account.  An example of this is when a consumer initiates a payment
through his/her bank or credit union to pay a utility bill.  A Direct Payment
processed as an ACH debit is where the utility initiates a withdrawal that takes
funds from the customer's account and transfers those funds to the utility
company's account.

37.    In 2012, the ACH Network processed more than 21 billion transactions
with a total dollar value of $36.9 trillion.  In 2012, the ACH Network processed
9.79 billion ACH debit transactions and 6.96 billion ACH credit transactions.

38.    Rules and regulations that govern the ACH network are established by
NACHA and the Federal Reserve.  NACHA manages the development,

administration, and governance of the ACH Network.  BMO and First Premier are "Direct Financial Institution Members of NACHA" and, as such, influence the governance and direction of the ACH Network and the NACHA Operating Rules by participating in the NACHA Rule Making Process, voting directly on Rules ballots, and by participating in and leading NACHA Councils, committees, and initiatives.  As Direct Financial Institution Members of NACHA, BMO and First Premier are also eligible to serve on the NACHA Board of Directors and further shape regulatory, legislative, and ACH Network policies.

39.     An ACH transaction takes place in many steps.  First, an accountholder (called a "Receiver") authorizes a transaction with a merchant—the business or person providing a good or service.  That merchant (called an "Originator") then communicates the purported authorization to its ODFI.  The ODFI is a bank and a member of the ACH Network.  The ODFI then transmits the ACH debit or credit through the pass-through "ACH Operator" to the accountholder's bank, known as the Receiving Depository Financial Institution ("RDFI").  The RDFI is also a member of the ACH Network, and is the entity that actually makes the credit or debit on its customer's checking or savings account.

40.     There are also "Third-Party Service Providers" which are entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries.  A

"Third-Party Sender" is a type of Third-Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

41.     The NACHA Rules specifically require all parties involved in the processing of ACH transactions to adhere to all state and federal laws in the United States.  These requirements are meant to keep illicit and unlawful transactions out of the ACH Network.

42.     The NACHA Rules require all participants in the ACH Network to perform risk-based due diligence and monitoring for unlawful transactions and merchants.  The following Policy Statement was adopted by the NACHA Board of Directors on August 22, 2002:

> Fraud and various forms of financial abuse have found their way into every facet of the U.S. payment systems. The NACHA Board believes that the Automated Clearing House Network must maintain the highest standards of fraud prevention to retain the integrity of the payment mechanism and the trust and confidence of its users. Therefore, the NACHA Board resolves and strongly urges that all participants implement adequate control systems to detect and prevent fraud and abusive financial transactions.

43.     NACHA Rules also require specific responsibilities of ODFIs, as discussed below.

**ODFIs Have Special Duties under NACHA
Operating Rules and Guidelines**

44.    NACHA characterizes ODFIs as "the gatekeepers of the ACH
Network."  As the party that enables an Originator--such as Illegal Online Payday
Lenders--to initiate debit entries on the ACH Network, NACHA operating rules
require an ODFI to enter into an Origination Agreement with each Originator for
which it will originate entries on the ACH Network or have an arrangement with a
Third-Party Sender that has such an Origination Agreement.  NACHA 2012
Operating Rules, Section 2.2, Subsection 2.2.1.

45.    An ODFI undertakes critical responsibilities under the NACHA Rules
that reflect the reliance of the ACH Network on appropriate underwriting and
monitoring of Originators by ODFIs.

46.    Under the NACHA Rules, "[a]n ODFI is responsible for all Entries
originated through the ODFI whether by an Originator or through a Third-Party
Sender . . . [a]n ODFI is responsible for its Originators' and Third-Party Senders'
compliance with these Rules."  NACHA 2012 Operating Rules, Section 2.1.

47.    NACHA Rules require all ODFIs to conduct a risk assessment of their
ACH activities, including, *inter alia*, "assessing the nature of risks associated with
ACH activity; performing appropriate know-your-customer due diligence; and
having adequate management, information and reporting systems to monitor and
mitigate risk."  *See* NACHA Operating Guidelines, Chapter 4.

48.    The NACHA Operating Guidelines caution that "ODFIs that choose to originate ACH entries . . . should be aware that both they and their Originators are subject to the NACHA Operating Rules and applicable U.S. law when transmitting these entries."  NACHA 2012 Operating Guidelines, Chapter 3 OFAC Requirements and Obligations, OG13.

49.    When an ODFI transmits an ACH entry, it is warranting to each RDFI and ACH Operator that, *inter alia,* the entry has been properly authorized.  NACHA 2012 Operating Rules Section 2.4, Subsection 2.4.1.1 (a).

50.    With regard to debit entries from consumer accounts (such as those that represent loan repayments to Illegal Online Payday Lenders), an authorization that is "otherwise invalid under applicable Legal Requirements does not satisfy the requirements" of an "authorization" under the NACHA Rules.  NACHA 2012 Operating Rules Section 2.3, Subsection 2.3.2.3 (b).

51.    Further, Subsections 2.2.1.1-2.2.1.2 of the NACHA Rules require ODFIs to enter into a written agreement with every Third-Party Sender or Originator (or merchant) for whom they originate ACH entries.  That agreement is to include an "agree[ment] not to originate Entries that violate the laws of the United States;" a "restriction on the types of entries that may be originated" and must include "the right of the ODFI to audit the Originator's or Third-Party Sender's compliance with the Origination Agreement and these Rules."

52.     Further, ODFIs have clear duties to "know your customer" and the NACHA Operating Rules make clear that they are intended to reflect that principle. NACHA 2012 Operating Guidelines, Chapter 3 OFAC Requirements and Obligations, OG13.

53.     On March 14, 2013, NACHA issued an advisory in response to certain negative press reports about collusion of ACH members with payday lenders.  In the release, NACHA reiterated the important policing duties of ODFIs:  "[E]ach ODFI is responsible for the valid authorization of every ACH debit processed in its name . . . In the case of authorizations from consumers, the NACHA Rules are explicit that, among other things, the authorization must 'be readily identifiable as an authorization'; and 'have clear and readily understandable terms.'  *If a purported authorization is invalid under applicable law, it does not meet this standard*."  (Emphasis added).

54.     NACHA went on to say:  "Because of these obligations, as well as associated reputational and other risks, the Federal banking agencies advise that ODFIs, among other things, should (i) exercise appropriate risk-based diligence when bringing on new Originators and Third Party Senders and (ii) perform appropriate monitoring to determine whether excessive returns or other suspicious patterns of activity warrant further review or more aggressive action.  For example, in 2006 the Office of the Comptroller of the Currency (OCC) released its risk

management guidance for ACH activities by national banks, OCC Bulletin 2006-39, in which it cautioned national banks acting as ODFIs to perform a risk-based evaluation of new Originators, including their historic patterns of unauthorized returns and whether they are engaged in legitimate business activities."

55.    The NACHA Operations Bulletin instructed ACH participants as follows: "ACH participants are strongly encouraged to establish business practices that ensure that ACH transactions do not facilitate illegal activity."

56.    In August 2013, NACHA sent a letter to banks warning them that authorizing access to customer accounts for Illegal Online Payday Lenders or their Third-Party Senders could violate NACHA rules.  In the letter, NACHA stated that under its rules, "purported authorizations to pay illegal loans that are unenforceable under applicable state law" are not valid.

**The FDIC Has Issued Guidance to State-Chartered Banks that Enter Into Payment Processor Relationships with Third Parties**

57.    The Federal Deposit Insurance Corporation ("FDIC") regulates state-chartered banks.

58.    On February 25, 2005, the FDIC issued guidance regarding Payday Lending and cautioned that such lending raises "significant risks" for banks, particularly when the payday lenders originate through Third-Party Senders.  The FDIC guidance makes clear that:

> The use of third parties in no way diminishes the
> responsibility of the board of directors and management to
> ensure that the third-party activity is conducted in a safe
> and sound manner and in compliance with policies and
> applicable laws.  Appropriate corrective actions, including
> enforcement actions, may be pursued for deficiencies
> related to a third-party relationship that pose concerns
> about either safety and [sic] soundness or the adequacy of
> protection afforded to consumers.

59.    On June 6, 2008, the FDIC issued additional "Guidance for Managing

Third-Party Risk" which began by noting that:

> An institution's board of directors and senior management
> are ultimately responsible for managing activities
> conducted through third-party relationships, and
> identifying and controlling the risks arising from such
> relationships, to the same extent as if the activity were
> handled within the institution.

60.    Among the risks to banks the FDIC identified in its June 6, 2008

"Guidance for Managing Third-Party Risk" was:

> Compliance risk.  Compliance risk is the risk arising from
> violations of laws, rules, or regulations, or from
> noncompliance with internal policies or procedures or
> with the institution's business standards.  This risk exists
> when the products or activities of a third party are not
> consistent with governing laws, rules, regulations,
> policies, or ethical standards.  For example, some third
> parties may engage in product marketing practices that are
> deceptive in violation of Section 5 of the Federal Trade
> Commission Act . . . Compliance risk is exacerbated when
> an institution has inadequate oversight, monitoring or
> audit functions.

61.     Accordingly, the FDIC advises banks to engage in "Due Diligence in Selecting a Third Party":

> Following an assessment of risks and a decision to proceed with a plan to establish a third-party relationship, management must select a qualified entity to implement the activity or program.  The due diligence process provides management with the information needed to address qualitative and quantitative aspects of potential third parties to determine if a relationship would help achieve the financial institution's strategic and financial goals and mitigate identified risks.  Not only should due diligence be performed prior to selecting a third party, but it should also be performed periodically during the course of the relationship, particularly when considering a renewal of a contract.
>
> *****
> Comprehensive due diligence involves a review of all available information about a potential third party, focusing on the entity's financial condition, its specific relevant experience, its knowledge of applicable laws and regulations, its reputation, and the scope and effectiveness of its operations and controls.

62.     On January 31, 2012, the FDIC issued revised guidance describing potential risks associated with relationships with third-party entities that process payments for telemarketers, online businesses, and other merchants.  In a footnote to the guidance, the FDIC provided, "[e]xamples of telemarketing, online businesses, and other merchants that may have a higher incidence of consumer fraud or potentially illegal activities or may otherwise pose elevated risk" which included "payday  or subprime loans."

63.     The FDIC advised banks that:

> . . . payment processors that deal with telemarketing and online merchants may have a higher risk profile because such entities have tended to display a higher incidence of consumer fraud or potentially illegal activities than some other businesses.  Given this variability of risk, payment processors must have effective processes for verifying their merchant clients' identities and reviewing their business practices.  Payment processors that do not have such processes can pose elevated money laundering and fraud risk for financial institutions, as well as legal, reputational, and compliance risks if consumers are harmed.

64.     The FDIC made clear that banks faced potential liability if they failed

to adequately manage their relationships  with payment processors:

> Deposit relationships with payment processors expose financial institutions to risks not customarily present in relationships with other commercial customers.  These include increased operational, strategic, credit, compliance, and transaction risks.  In addition, financial institutions should consider the potential for legal, reputational, and other risks, including risks associated with a high or increasing number of customer complaints and returned items, and the potential for claims of unfair or deceptive practices.  ***Financial institutions that fail to adequately manage these relationships may be viewed as facilitating a payment processor's or merchant client's fraudulent or unlawful activity and, thus, may be liable for such acts or practices.***  In such cases, the financial institution and responsible individuals have been subject to a variety of enforcement and other actions. ***Financial institutions must recognize and understand the businesses and customers with which they have relationships and the liability risk for facilitating or aiding and abetting consumer unfairness or deception*** under Section 5 of the Federal Trade Commission Act.

(Emphasis added).

### The OCC Has Issued Guidance to All Banks
### On Managing the Risks of ACH Activity

65.    The OCC supervises national banks.

66.    On September 1, 2006, the OCC provided guidance for national banks and examiners on managing the risks of ACH activity, explaining that "[n]ational banks may be exposed to a variety of risks when originating, receiving, or processing ACH transactions, or outsourcing these activities to a third party."

67.    The guidance advised:

High-Risk Activities

Banks that engage in ACH transactions with high-risk originators or that involve third-party senders face increased reputation, credit, transaction, and compliance risks. High-risk originators include companies engaged in potentially illegal activities or that have an unusually high volume of unauthorized returns.

Before a bank engages in high-risk ACH activities, the board of directors should consider carefully the risks associated with these activities, particularly the increased reputation, compliance, transaction, and credit risks. The board should provide clear direction to management on whether, or to what extent, the bank may engage in such ACH activities. Some banks have established policies prohibiting transactions with certain high-risk originators and third-party senders.

68.    In a footnote to the guidance, the OCC made the risks to banks even clearer, "*[r]isks may include the risk of legal liability* or damage to an institution's

reputation when ***originators or third-party senders facilitate or engage in activities that violate criminal laws***." (Emphasis added).

69. On April 24, 2008, the OCC provided guidance for national banks and examiners on managing the risks of ACH activity originated by Third-Party Processors, cautioning that:

> Banks should also consider carefully the legal, reputation, and other risks presented by relationships with processors including risks associated with customer complaints, returned items, and potential unfair or deceptive practices. ***Banks that do not have the appropriate controls to address the risks in these relationships may be viewed as facilitating a processor's or its merchant client's fraud or other unlawful activity***. (Emphasis added).

70. The guidance reminded banks that they:

> . . . must implement a due diligence and underwriting policy that, among other things, requires an initial background check of the processor and its underlying merchants to support the validity of the processor's and merchants' businesses, their creditworthiness, and business practices.
>
> *****
>
> By implementing the appropriate controls over processors and their merchant clients, a bank should be able to identify those processors that process for fraudulent telemarketers or other unscrupulous merchants and to ensure that the bank is not facilitating these transactions. In the event a bank identifies fraudulent or other improper activity with a processor or a specific merchant client of the processor, the bank should take immediate steps to address the problem, including filing a Suspicious Activity Report when appropriate, terminating the bank's

relationship with the processor, or requiring the processor to cease processing for that specific merchant.

71.     The guidance concludes that:

> The OCC supports national banks' participation in payment systems to serve the needs of legitimate processors and the customers of such processors and to diversify sources of revenue.  However, to limit potential risk to banks and consumers, banks should ensure implementation of risk management programs that include appropriate oversight and controls commensurate with the risk and complexity of the activities.  At a minimum, bank programs should verify the legitimacy of the processor's business operations, assess the bank's risk level, and monitor processor relationships for activity indicative of fraud.

## Defendants Knew the Illegal Online Payday Lenders Were Engaged In Unlawful Activities

72.     At the time Defendants originated the entries on the ACH Network referenced herein, they knew the identity of the Illegal Online Payday Lenders, they knew the lenders were engaged in the business of making payday loans, and they knew the Illegal Online Payday Lenders were engaged in the business of making payday loans in states where payday lending was unlawful.

73.     Characteristics of Illegal Online Payday Lender transactions themselves also notified ODFIs of unlawful activity.

74.     Whether ODFIs contract with Illegal Online Payday Lenders or their Third Party Senders, ACH debits originated at the request of Illegal Online Payday

Lenders inevitably raise "red flags" to ODFIs which alert them to the fact that potential unlawful activity is occurring.

75.     Chief among these "red flags" are high return rates on ACH debit transactions.  An ACH debit transaction may be returned for numerous reasons including, *inter alia*, the account to be debited having insufficient funds or the account owner claiming the debit was not authorized.

76.     ACH debits originated on behalf of the Illegal Online Payday Lenders far exceed the return rate for all electronic payments of less than 1%.

### FACTS AS TO PLAINTIFF JOHNETTA RILEY

77.     On or about September 27, 2012, Plaintiff applied for and received a payday loan in the amount of $300 from SWB Funding by completing an application on the **www.swbfunding.com** website. As part of the application process, Plaintiff authorized SWB Funding to debit her checking account with Wells Fargo in order to repay the loan.

78.     The interest rate on the loan was 30%.  The entirety of the interest plus principal, which equaled $390, was due 15 days from the date of the loan.

79.     Thus, the nominal annual interest rate on the loan was at least 730%.

80.     Beginning on or about October 12, 2012, SWB Funding originated regular debit transactions from Plaintiff's checking account to repay the loan.

81.    On or about May 24, 2013, Plaintiff applied for and received an additional payday loan in the amount of $400 from SWB Funding by completing an application on the **www.swbfunding.com** website. As part of the application process, Plaintiff authorized SWB Funding to debit her checking account with Wells Fargo in order to repay the loan.

82.    The interest rate on the loan was 30%. The entirety of the interest plus principal, which equaled $520, was due 14 days from the date of the loan.

83.    Thus, the nominal annual interest rate on the loan was at least 782.14%.

84.    Beginning on or about June 7, 2013, Cash Jar originated regular debit transactions from Plaintiff's checking account to repay the loan.

85.    On or about September 13, 2013, SWB Funding originated a debit transaction of $120 from Plaintiff's checking account in the District of Columbia through the ACH Network. The ODFI originating this transaction was Defendant Missouri Bank & Trust.

86.    On or about January 29, 2013 Plaintiff applied for and received a payday loan in the amount of $1200 from Cash Jar by completing an application on the **www.cashjar.com** website. As part of the application process, Plaintiff authorized Cash Jar to debit her checking account with Wells Fargo in order to repay the loan.

87.     The interest rate on the loan was 25%.  The entirety of the interest plus principal, which equaled $1500, was due 17 days from the date of the loan.

88.     Thus, the nominal annual interest rate on the loan was at least 536.76%.

89.     Beginning on or about February 15, 2013, Cash Jar originated regular debit transactions from Plaintiff's checking account to repay the loan.

90.     On or about April 30, 2013, Plaintiff applied for and received an additional payday loan in the amount of $700 from Cash Jar by completing an application on the **www.cashjar.com** website. As part of the application process, Plaintiff authorized Cash Jar to debit her checking account with Wells Fargo in order to repay the loan.

91.     The interest rate on the loan was 25%. The entirety of the interest plus principal, which equaled $875, was due 10 days from the date of the loan.

92.     Thus, the nominal annual interest rate on the loan was at least 912.5%.

93.     Beginning on or about May 10, 2013, Cash Jar originated regular debit transactions from Plaintiff's checking account to repay the loan.

94.     On or about August 2, 2013, Cash Jar originated a debit transaction of $200 from Plaintiff's checking account in the District of Columbia through the ACH Network. The ODFI originating this transaction was Defendant First Premier Bank.

95.     On or about September 13, 2013, Cash Jar originated a debit transaction of $162.50 for Plaintiff's checking account in the District of Columbia through the ACH Network. The ODFI originating this transaction was Defendant BMO Harris Bank, N.A.

96.     Defendants BMO, First Premier, and MBT derived a benefit through the receipt of fees for their origination of debit entries on the ACH Network initiated by SWB Funding and Cash Jar (or Third-Party Senders acting on their behalf) and withdrawn from Plaintiff.

## CLASS ACTION ALLEGATIONS

97.     <u>Description of the Class</u>:  Plaintiff brings this class action on behalf of herself and a Class defined as follows:

> i.     All natural persons within the District of Columbia whose accounts were debited via an ACH entry originated by either BMO Harris Bank, N.A., First Premier Bank, or Missouri Bank and Trust as an ODFI on behalf of an Illegal Online Payday Lender in repayment of a loan which was illegal under District of Columbia law (the "Class").

98.     Excluded from the Class are Defendants' officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns.  Also excluded from the Class is any judge, justice or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

99.   <u>Numerosity</u>:  The proposed Class is so numerous that individual joinder of all members is impracticable.

100.   <u>Common Questions of Law and Fact Predominate</u>:  There are many questions of law and fact common to Plaintiff and the Class, and those questions substantially predominate over any questions that may affect individual Class members.  Common questions of fact and law include (a) whether payday loans are usurious and unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury; (b) whether debts owed to payday lenders are incurred in connection with the business of lending money at an usurious rate; (c) whether the usurious rate was at least twice the enforceable rate under the law of the states in which Class members reside; (d) whether Defendants' collection of the illegal or unenforceable debt was made with actual or constructive knowledge of the illegality of the loans; (e) whether Defendants' collection of the illegal debt was the proximate cause of the Class's injuries; (f) whether the Class suffered an injury to property by the debiting of their accounts by Defendants; and (g) whether the running of the statute of limitations for the Class's claims should be equitably tolled.

101.   <u>Typicality</u>:  Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and all members of the Class have been similarly affected by BMO's, First Premier's and MBT's actions.

102.   <u>Adequacy of Representation</u>:  Plaintiff will fairly and adequately represent and protect the interests of the Class.  Plaintiff has retained counsel with substantial experience in prosecuting complex and class action litigation.  Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so.

103.   <u>Superiority of Class Action</u>:  Plaintiff and the members of the Class suffered, and will continue to suffer, harm as a result of Defendants' unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the present controversy.  Individual joinder of all members of the Class is impractical.  Even if individual class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Defendants' common course of conduct.  The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all class members' claims in a single forum.  The conduct of this action as a class action conserves the resources of the parties and of the judicial system, and protects the rights of the class members.

## FIRST CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(c) by BMO

104.  Plaintiff incorporates by reference the preceding paragraphs.

105.  BMO is a "person" as defined by 18 U.S.C. § 1961(3).

106.  The ACH Network is comprised of the following participants:

   a.  "Originators," which include individuals, corporations, or other entities that initiate entries into the ACH Network, including Illegal Online Payday Lenders;

   b.  "ODFIs," which include all participating financial institutions that originate ACH entries at the request of an Originator or Third Party Service Provider and agree to abide by the NACHA Operating Rules, including BMO;

   c.  "RDFIs," which include all participating financial institutions that are qualified to receive ACH entries and agree to abide by the NACHA Operating Rules;

   d.  "Receivers," which include individuals, corporations or other entities that have authorized an Originator to initiate a credit or debit entry to a transaction account held at an RDFI;

   e.  "ACH Operators," which include two central clearing facilities, the Federal Reserve Banks, and Electronic Payments Network (EPN), that process ACH transactions between financial institutions; and

f.  "Third-Party Service Providers," which include entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries.   A "Third-Party Sender" is a type of Third-Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

107.   The ACH Network constitutes an "enterprise" pursuant to 18 U.S.C. § 1961(4) as an association of multiple legal entities operating under NACHA. Alternatively, participants in the ACH Network constitute an "association-in-fact" enterprise as those terms are used in 18 U.S.C. § 1961(4) (**the "ACH Enterprise"**) in that:

a.  Participants in the ACH Enterprise share a common purpose of facilitating large volume batch processing of electronic payments (credit and debit transactions) for and between participating depository financial institutions;

b.  To achieve this common purpose, participants in the ACH Enterprise preserve close business relationships and maintain established and defined roles within the enterprise;

c. The ACH Enterprise has been in existence for many years, is still ongoing, and has longevity sufficient to permit the participants to achieve their common purpose.

108. The ACH Enterprise is an enterprise engaged in and whose activities, including daily volume batch processing of electronic payments across the United States, affect interstate commerce. BMO is associated with the ACH Enterprise through its role as an ODFI within the ACH Enterprise.

109. BMO, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Enterprise. Under the NACHA Operating Rules, BMO serves the critical function of "gatekeeper of the ACH Network" and is responsible for all entries originated through BMO, whether initiated by an Originator, or by a Third Party Service Provider acting on the Originator's behalf.

110. In order to initiate debit entries from consumer checking accounts on the ACH network, Illegal Online Payday Lenders, or Third-Party Senders acting on their behalf, must enter into an Origination Agreement with an ODFI, such as BMO, and the ODFI must originate the ACH debit. Pursuant to NACHA Operating Rules, when an ODFI originates an ACH entry (in this case debit), it is warranting to each RDFI and ACH Operator that the entry has been properly authorized, meaning that it is, among other things, compliant with the NACHA Operating Rules and state and federal laws.

111.    BMO has used its role within the ACH Enterprise to conduct and participate in the collection of unlawful debts by originating entries on the ACH Network at the request of Illegal Online Payday Lenders (or Third-Party Senders operating on behalf of Illegal Online Payday Lenders) which debit the accounts of persons residing in states in which payday lending is illegal.  The loans made by the Illegal Online Payday Lenders are "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

   a.  unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury;

   b.  incurred in connection with the business of lending money at a rate usurious under State or Federal law; and

   c.  the usurious rate was at least twice the enforceable rate.

112.    BMO, in its role as an ODFI in the ACH Enterprise, originated debit entries on the ACH Network initiated by Illegal Online Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that BMO knew routinely violate state law; and originated debit entries that BMO knew were in violation of state law, the NACHA Operating Rules, and FDIC and OCC guidelines.

113.    Pursuant to the fraudulent scheme, BMO participated in the collection of unlawful debts in that:

33

a.  Illegal Online Payday Lenders, or Third-party Senders acting on their behalf, initiated the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

b.  BMO then originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

c.  BMO knew that the Illegal Online Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in the District of Columbia and still originated ACH debit entries into the District at the request of the Illegal Online Payday Lenders in violation of 18 U.S.C. §1962(c).

114.  Accordingly, BMO has directly and indirectly conducted and participated in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

115.  As a direct and proximate result of BMO's violations of 18 U.S.C. § 1962(c), Plaintiff and the members of the Class were injured in their property by the debiting of their bank accounts by BMO and such injury was reasonably foreseeable.

## SECOND CLAIM FOR RELIEF
## Violation of 18 U.S.C. § 1962(d) by BMO

116.   Plaintiff incorporates by reference the preceding paragraphs.

117.   BMO and Illegal Online Payday Lenders, or Third Party Senders acting on their behalf, reached an agreement to use their respective roles within the ACH Enterprise to facilitate payday loans to consumers residing in states that banned the practice and collect usurious interest rates in violation of state law. Their endeavor, if completed, would constitute the collection of "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

  a.   unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury;

  b.   incurred in connection with the business of lending money at a rate usurious under State or Federal law; and

  c.   the usurious rate was at least twice the enforceable rate.

118.   In furtherance of their agreement, BMO and Illegal Online Payday Lenders agreed to take certain acts to facilitate the collection of unlawful debts:

  a.   Illegal Online Payday Lenders (or Third-Party Senders operating on behalf of Illegal Online Payday Lenders) agreed to initiate the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

    b.  BMO agreed to originate ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

    c.  BMO knew that the Illegal Online Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in the District of Columbia and still originated ACH debit entries into he District at the request of the Illegal Online Payday Lenders in violation of 18 U.S.C. §1962(c).

119.   Accordingly, BMO intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

120.   As a direct and proximate result of BMO and Illegal Online Payday Lenders' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff and the members of the Class were injured in their property by the debiting of their bank accounts by BMO and such injury was reasonably foreseeable.

## THIRD CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(c) by First Premier Bank

128.   Plaintiff incorporates by reference the preceding paragraphs.

129.   First Premier is a "person" as defined by 18 U.S.C. § 1961(3).

130.   The ACH Network is comprised of the following participants:

a.    "Originators," which include individuals, corporations, or other entities that initiate entries into the ACH Network, including Illegal Online Payday Lenders;

b.    "ODFIs," which include all participating financial institutions that originate ACH entries at the request of an Originator or Third Party Service Provider and agree to abide by the NACHA Operating Rules, including First Premier;

c.    "RDFIs," which include all participating financial institutions that are qualified to receive ACH entries and agree to abide by the NACHA Operating Rules;

d.    "Receivers," which include individuals, corporations or other entities that have authorized an Originator to initiate a credit or debit entry to a transaction account held at an RDFI;

e.    "ACH Operators," which include two central clearing facilities, the Federal Reserve Banks, and Electronic Payments Network (EPN), that process ACH transactions between financial institutions; and

f.    "Third-Party Service Providers," which include entities other than the Originator, ODFI, or RDFI that perform any function

on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries.  A "Third-Party Sender" is a type of Third Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

131.   The ACH Network constitutes an "enterprise" pursuant to 18 U.S.C. § 1961(4) as an association of multiple legal entities operating under NACHA. Alternatively, participants in the ACH network constitute an "association-in-fact" enterprise as those terms are used in 18 U.S.C. § 1961(4) (**the "ACH Enterprise"**) in that:

a.   Participants in the ACH Enterprise share a common purpose of facilitating large volume batch processing of electronic payments (credit and debit transactions) for and between participating depository financial institutions;

b.   To achieve this common purpose, participants in the ACH Enterprise preserve close business relationships and maintain established and defined roles within the enterprise;

c.   The ACH Enterprise has been in existence for many years, is still ongoing, and has longevity sufficient to permit the participants to achieve their common purpose.

132.    The ACH Enterprise is an enterprise engaged in and whose activities, including daily volume batch processing of electronic payments across the United States, affect interstate commerce.  First Premier is associated with the ACH Enterprise through its role as an ODFI within the ACH Enterprise.

133.    First Premier, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Enterprise.  Under the NACHA Operating Rules, First Premier serves the critical function of "gatekeeper of the ACH Network" and is responsible for all entries originated through First Premier, whether initiated by an Originator, or by Third-Party Senders acting on the Originator's behalf.

134.    In order to initiate debit entries from consumer checking accounts on the ACH network, Illegal Online Payday Lenders, or Third-Party Senders acting on their behalf, must enter into an Origination Agreement with an ODFI, such as First Premier, and the ODFI must originate the ACH debit.   Pursuant to NACHA Operating Rules, when an ODFI originates an ACH entry (in this case debit), it is warranting to each RDFI and ACH Operator that the entry has been properly authorized meaning that it is, among other things, compliant with the NACHA Operating Rules and state and federal laws.

135.    First Premier has used its role within the ACH Enterprise to conduct and participate in the collection of unlawful debts by originating entries on the ACH

Network at the request of Illegal Online Payday Lenders (or Third-Party Senders operating on behalf of Illegal Online Payday Lenders) which debit the accounts of persons residing in states in which payday lending is illegal.  The loans made by the Illegal Online Payday Lenders are "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

      a.    unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury;

      b.    incurred in connection with the business of lending money at at a rate  usurious under State or Federal law; and

      c.    the usurious rate was at least twice the enforceable rate.

136.   First Premier, in its role as an ODFI in the ACH Enterprise, originated debit entries initiated by Illegal Online Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that First Premier knew routinely violate state law; and originated debit entries that First Premier knew were in violation of state law, the NACHA Operating Rules, and FDIC and OCC guidelines.

137.   Pursuant to the fraudulent scheme, First Premier engaged in the collection of unlawful debts in that:

      a.    Illegal Online Payday Lenders, or Third-Party Senders acting on their behalf, initiated the transactions whereby borrowers' bank

accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

b.      First Premier then originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

c.      First Premier knew that the Illegal Online Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in the District of Columbia and still originated ACH debit entries into the District on behalf of the Illegal Online Payday Lenders in violation of 18 U.S.C. §1962(c).

138.    Accordingly, First Premier has directly and indirectly conducted and participated in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

139.    As a direct and proximate result of First Premier's violations of 18 U.S.C. § 1962(c), Plaintiff and the members of the Class were injured in their property by the debiting of their bank accounts by First Premier and such injury was reasonably foreseeable.

### FOURTH CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(d) by First Premier

140.    Plaintiff incorporates by reference the preceding paragraphs.

141.   First Premier and Illegal Online Payday Lenders, or Third Party Senders acting on their behalf, reached an agreement to use their respective roles within the ACH Enterprise to facilitate payday loans to consumers residing in states that banned the practice and collect usurious interest rates in violation of state law. Their endeavor, if completed, would constitute the collection of "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

a.   unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury;

b.   incurred in connection with the business of lending money at a rate  usurious under State or Federal law; and

c.   the usurious rate was at least twice the enforceable rate.

142.   In furtherance of their agreement, First Premier and Illegal Online Payday Lenders agreed to take certain acts to facilitate the collection of unlawful debts:

a.   Illegal Online Payday Lenders (or Third-Party Senders operating on behalf of Illegal Online Payday Lenders) agreed to initiate the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

b.    First Premier agreed to originate ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

c.    First Premier knew that the Illegal Online Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in the District of Columbia and still originated ACH debit entries into the District at the request of the Illegal Online Payday Lenders in violation of 18 U.S.C. §1962(c).

143.   Accordingly, First Premier intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

144.   As a direct and proximate result of First Premier and Illegal Online Payday Lenders' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff and the members of the Class were injured in their property by the debiting of their bank accounts by First Premier and such injury was reasonably foreseeable.

**FIFTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c) by MBT**

145.   Plaintiff incorporates by reference the preceding paragraphs.

146.   MBT is a "person" as defined by 18 U.S.C. § 1961(3).

147.   The ACH Network is comprised of  the following participants:

    a.    "Originators," which include individuals, corporations or other entities that initiate entries into the ACH Network, including Illegal Online Payday Lenders;

    b.    "ODFIs," which include all participating financial institutions that originate ACH entries at the request of an Originator or Third Party Service Provider and agree to abide by the NACHA Operating Rules, including MBT;

    c.    "RDFIs," which include all participating financial institutions that are qualified to receive ACH entries and agree to abide by the NACHA Operating Rules;

    d.    "Receivers," which include individuals, corporations, or other entities that have authorized an Originator to initiate a credit or debit entry to a transaction account held at an RDFI;

    e.    "ACH Operators," which include two central clearing facilities, the Federal Reserve Banks, and Electronic Payments Network (EPN), that process ACH transactions between financial institutions; and

    f.    "Third-Party Service Providers," which include entities other than the Originator, ODFI, or RDFI that perform any function

on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries.  A "Third-Party Sender" is a type of Third Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

148.   The ACH Network constitutes an "enterprise" pursuant to 18 U.S.C. § 1961(4) as an association of multiple legal entities operating under NACHA. Alternatively, participants in the ACH network constitute an "association-in-fact" enterprise as those terms are used in 18 U.S.C. § 1961(4) (**the "ACH Enterprise"**) in that:

a.    Participants in the ACH Enterprise share a common purpose of facilitating large volume batch processing of electronic payments (credit and debit transactions) for and between participating depository financial institutions;

b.    To achieve this common purpose, participants in the ACH Enterprise preserve close business relationships and maintain established and defined roles within the enterprise;

c.    The ACH Enterprise has been in existence for many years, is still ongoing, and has longevity sufficient to permit the participants to achieve their common purpose.

149.   The ACH Enterprise is an enterprise engaged in and whose activities, including daily volume batch processing of electronic payments across the United States, affect interstate commerce.  MBT is associated with the ACH Enterprise through its role as an ODFI within the ACH Enterprise.

150.   MBT, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Enterprise.  Under the NACHA Operating Rules, MBT serves the critical function of "gatekeeper of the ACH Network" and is responsible for all entries originated through MBT, whether initiated by an Originator, or by Third-Party Senders acting on the Originator's behalf.

151.   In order to initiate debit entries from consumer checking accounts on the ACH network, Illegal Online Payday Lenders, or Third-Party Senders acting on their behalf, must enter into an Origination Agreement with an ODFI, such as MBT, and the ODFI must originate the ACH debit.   Pursuant to NACHA Operating Rules, when an ODFI originates an ACH entry (in this case debit), it is warranting to each RDFI and ACH Operator that the entry has been properly authorized meaning that it is, among other things, compliant with the NACHA Operating Rules and state and federal laws.

152.   MBT has used its role within the ACH Enterprise to conduct and participate in the collection of unlawful debts by originating entries on the ACH Network at the request of Illegal Online Payday Lenders (or Third-Party Senders

operating on behalf of Illegal Online Payday Lenders) which debit the accounts of persons residing in states in which payday lending is illegal.  The loans made by the Illegal Online Payday Lenders are "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

a.   unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury;

b.   incurred in connection with the business of lending money at a rate  usurious under State or Federal law; and

c.   the usurious rate was at least twice the enforceable rate.

153.   MBT, in its role as an ODFI in the ACH Enterprise, originated debit entries on the ACH Network initiated by Illegal Online Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that MBT knew routinely violate state law; and originated debit entries that MBT knew were in violation of state law, the NACHA Operating Rules, and FDIC and OCC guidelines.

154.   Pursuant to the fraudulent scheme, MBT engaged in the collection of unlawful debts in that:

a.   Illegal Online Payday Lenders, or Third-Party Senders acting on their behalf, initiated the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

b.     MBT then originated ACH entries by which the accounts were

debited and the unlawful debts collected in violation of 18

U.S.C. §1962(c);

c.     MBT knew that the Illegal Online Payday Lenders were payday

lenders and that payday loans were illegal and unenforceable in

the District of Columbia and still originated ACH debit entries

into the District at the request of the Illegal Online Payday

Lenders in violation of 18 U.S.C. §1962(c).

155.   Accordingly, MBT has directly and indirectly conducted and

participated in the conduct of the affairs of the ACH Enterprise through the

collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

156.   As a direct and proximate result of MBT's violations of 18 U.S.C. §

1962(c), Plaintiff and the members of the Class were injured in their property by the

debiting of their bank accounts by MBT and such injury was reasonably

foreseeable.

## SIXTH CLAIM FOR RELIEF
## Violation of 18 U.S.C. § 1962(d) by MBT

157.   Plaintiff incorporates by reference the preceding paragraphs.

158.   MBT and Illegal Online Payday Lenders, or Third-Party Senders

acting on their behalf, reached an agreement to use their respective roles within the

ACH Enterprise to facilitate payday loans to consumers residing in states that

48

banned the practice and collect usurious interest rates in violation of state law.

Their endeavor, if completed, would constitute the collection of "unlawful debts"

under 18 U.S.C. § 1961(6) in that the loans are:

      a.    unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury;

      b.    incurred in connection with the business of lending money at a rate  usurious under State or Federal law; and

      c.    the usurious rate was at least twice the enforceable rate.

159.  In furtherance of their agreement, MBT and Illegal Online Payday Lenders agreed to take certain acts to facilitate the collection of unlawful debts:

      a.    Illegal Online Payday Lenders (or Third-Party Senders operating on behalf of Illegal Online Payday Lenders) agreed to initiate the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

      b.    MBT agreed to originate ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

      c.    MBT knew that the Illegal Online Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in

the District of Columbia and still originated ACH debit entries

into the District at the request of the Illegal Online Payday

Lenders in violation of 18 U.S.C. §1962(c).

160.   Accordingly, MBT intentionally conspired and agreed to directly and

indirectly conduct and participate in the conduct of the affairs of the ACH

Enterprise through the collection of unlawful debts in violation of 18 U.S.C. §

1962(c).

161.   As a direct and proximate result of MBT and Illegal Online Payday

Lenders' conspiracy, the overt acts taken in furtherance of that conspiracy, and

violations of 18 U.S.C. § 1962(d), Plaintiff and the members of the Class were

injured in their property by the debiting of their bank accounts by MBT and such

injury was reasonably foreseeable.

## SEVENTH CLAIM FOR RELIEF
### Assumpsit against All Defendants

162.   Plaintiff incorporates by reference the preceding paragraphs.

163.   Defendants BMO, First Premier, and MBT received funds belonging to

Plaintiff and members of the Class.

164.   Defendants BMO, First Premier, and MBT's receipt of money

belonging to Plaintiff and members of the Class was improper because the money

represented payments of interest exceeding 24% per annum.

165.    Defendants BMO, First Premier, and MBT benefited from receipt of the funds.

166.    Plaintiff and members of the Class are entitled to return of the funds received by BMO, First Premier, and MBT.

167.    Because the funds received from Plaintiff and member of the Class are, upon information and belief, no longer in the possession of BMO, First Premier, and MBT, Plaintiff has a right to restitution *at law* from BMO, First Premier, and MBT.

### EIGHTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of the D.C. Payday Lending Law
### D.C. Code § 26-319

168.    Plaintiff incorporates by reference the preceding paragraphs.

169.    The District of Columbia bans payday loans.  D.C. Code § 26-319.

170.    Cash Jar and SWB Funding make payday loans in violation of D.C. law.

171.    BMO, First Premier, and MBT aided and abetted the Illegal Online Payday Lenders' violations of D.C. law by providing the necessary access to the ACH system to carry out the Illegal Online Payday Lenders' illegal scheme.

172.    In providing the necessary access to the ACH system to carry out the Illegal Online Payday Lenders' illegal scheme, Defendants knowingly provided

substantial assistance to—and profited from—the illegal lending activities of the Illegal Online Payday Lenders.

173.   At the time Defendants provided the necessary access to the ACH system to carry out the Illegal Online Payday Lenders' illegal scheme, they knew the identity of the Illegal Online Payday Lenders, including their unlawful activity.

174.   Defendants were prohibited by NACHA Rules from honoring ACH transactions on unlawful payday loans.

175.   Defendants were aware of the illegal nature of the lending activities of the Illegal Online Payday Lenders through due diligence procedures.

176.   As a result of Defendants' knowing participation in the making of illegal payday loans, each is liable as an aider and abettor to the violations of D.C. law referenced herein.

**NINTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of D.C. Usury Law**
**D.C. Code § 28-3301, *et seq*.**

177.   Plaintiff incorporates by reference the preceding paragraphs.

178.   The District's usury law states:  "the parties to an instrument in writing for the payment of money at a future time may contract therein for the payment of interest on the principal amount thereof at a rate not exceeding 24% per annum." D.C. Code § 28-3301.

179.   "Interest" includes "any compensation directly or indirectly imposed by a lender for the extension of credit for the use or forbearance of money, including any loan fee, origination fee, service and carrying charge, [and] investigator's fee[.]"  D.C. Code § 28-3311.

180.   D.C. law also provides that "[i]n an action upon a contract for the payment of money with interest at a rate forbidden by law, any payment of interest that may have been made on account of the contract is deemed to be payment made on account of the principal debt."  D.C. Code § 28-3305.

181.   As set forth more fully above, in the course of making and collecting on payday loans to consumers in the District of Columbia, Illegal Online Payday Lenders repeatedly and knowingly charged, demanded, and accepted interest at a rate greater than 24% per annum in violation of D.C. Code § 28-3301.

182.   Defendants aided and abetted the Illegal Online Payday Lenders' violations of D.C. usury law.

183.   On the dates specified above, Defendants credited and debited money from Plaintiff's checking accounts and electronically transmitted it to the Illegal Online Payday Lenders, or Third-Party Senders acting on their behalf.

184.   In making these debits, credits, and transmissions, Defendants knowingly provided substantial assistance to—and profited from—the illegal lending activities of the Illegal Online Payday Lenders.

185.   At the time Defendants made these electronic withdrawals and transfers, they knew the identity of the Illegal Online Payday Lenders, including their unlawful activity.

186.   Defendants were prohibited by NACHA Rules from honoring ACH transactions on unlawful payday loans.

187.   Defendants were aware of the illegal nature of the lending activities of the Illegal Online Payday Lenders through due diligence procedures.

188.   At the time Defendants transmitted these funds, they knowingly assisted the Illegal Online Payday Lenders and were incentivized to do so by a bare profit motive.

189.   As a result of Defendants' knowing participation in the making of illegal payday loans, each is liable as an aider and abettor to the violations of the D.C. usury law referenced herein.

## TENTH CAUSE OF ACTION
### Permanent Injunctive Relief

190.   Plaintiff re-alleges the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

191.   Defendants BMO, First Premier, and MBT should be enjoined and prohibited from serving as the ODFI for Out-Of State Payday Lenders and directed to immediately credit to all Illegal Online Payday Lender borrowers any money

Defendants have debited from borrowers' accounts but have not yet remitted to Illegal Online Payday Lenders.

**WHEREFORE**, Plaintiff on her behalf and on behalf of the Class seeks judgment in an amount to be determined at trial but not less than $5,000,000, as follows:

(a)        Under 18 U.S.C. § 1964(c), awarding each member of Class damages from BMO for BMO's violations of 18 U.S.C. § 1962(c) consisting of a refund of every ACH debit from their account in which BMO was the ODFI and which represented any payment of interest to an Illegal Online Payday Lender, trebled;

(b)        Under 18 U.S.C. § 1964(c), awarding each member of the Class damages from BMO for BMO's violations of 18 U.S.C. § 1962(d) consisting of a refund of every ACH debit from their account in which BMO was the ODFI and which represented any payment of interest to an Illegal Online Payday Lender, trebled;

(c)        Under 18 U.S.C. § 1964(c), awarding each member of the Class damages from First Premier Bank for First Premier's violations of 18 U.S.C. § 1962(c) consisting of a refund of every ACH debit from their account in which First Premier was the ODFI and which

represented:  any payment of interest to an Illegal Online Payday Lender, trebled;

(d)     Under 18 U.S.C. § 1964(c), awarding each member of the Class damages from First Premier Bank for First Premier's violations of 18 U.S.C. § 1962(d) consisting of a refund of every ACH debit from their account in which First Premier was the ODFI and which represented  any payment of interest to an Illegal Online Payday Lender, trebled;

(e)     Under 18 U.S.C. § 1964(c), awarding each member of the Class damages from Missouri Bank and Trust for MBT's violations of 18 U.S.C. § 1962(c) consisting of a refund of every ACH debit from their account in which MBT was the ODFI and which represented any payment of interest to an Illegal Online Payday Lender, trebled;

(f)     Under 18 U.S.C. § 1964(c), awarding each member of the Class damages from MBT for MBT's violations of 18 U.S.C. § 1962(d) consisting of a refund of every ACH debit from their account in which MBT was the ODFI and which represented any payment of interest to an Illegal Online Payday Lender, trebled;

(g)     Permitting each member of the Class to recover damages in assumpsit from all Defendants consisting of a refund of every ACH debit from their account in which Defendants were the ODFI and which represented repayment of a loan from an Illegal Online Payday Lender;

(h)     Compelling Defendants to disgorge in a common fund for the benefit of Plaintiff and the Class all wrongful or inequitable proceeds received from them.  A constructive trust should be established over all the proceeds in Defendants' possession belonging to Plaintiff and members of the Class;

(i)     Awarding the Class damages against all Defendants as aiders and abettors to the violations of the D.C. Payday Lending Law, D.C. Code § 26-319;

(j)     Awarding the Class damages against all Defendants as aiders and abettors to the violations of the D.C. Usury Law, D.C. Code § 28-3301, *et seq.*;

(k)     Granting a permanent injunction enjoining and prohibiting Defendants from serving as the ODFI for Illegal Online Payday Lenders and directing Defendants to immediately credit to all Illegal Online Payday Lenders' borrowers any money they have

debited from borrowers' accounts but have not yet remitted to

Illegal Online Payday Lenders;

(l)      Awarding Plaintiff's attorneys' fees and costs in pursuing this

action; and

(m)     Awarding such other and further relief as this Court deems just,

proper and equitable.

## **JURY DEMAND**

Plaintiff hereby demands a jury trial in the instant action.


Dated:  October 28, 2013            Respectfully submitted,

**TYCKO & ZAVAREEI LLP**


By:    /s/ Hassan A. Zavareei
     Hassan A. Zavareei, D.C. Bar No. 456161
     Jeffrey D. Kaliel, D.C Bar No. 983578
     Anna C. Haac, D.C. Bar No. 979449
     2000 L Street, N.W., Suite 808
     Washington, D.C. 20036
     Telephone: 202-973-0900
     Facsimile: 202-973-0950
     hzavareei@tzlegal.com
     jkaliel@tzlegal.com
     ahaac@tzlegal.com

**CHITWOOD HARLEY HARNES LLP**
Darren T. Kaplan, *pro hac vice forthcoming*
1350 Broadway, Suite 908
New York, NY 10018

Tel: (917) 595-3600
Fax: (404) 876-4476
dkaplan@chitwoodlaw.com

**STUEVE SIEGEL HANSON LLP**
Norman E. Siegel, *pro hac vice forthcoming*
Steve Six, *pro hac vice forthcoming*
J. Austin Moore, *pro hac vice forthcoming*
460 Nichols Road, Suite 200
Kansas City, MO 64112

Tel:   (816) 714-7100
Fax:   (816) 714-7101
siegel@stuevesiegel.com
six@stuevesiegel.com
moore@stuevesiegel.com

**KOPELOWITZ OSTROW P.A.**
Jeffrey M. Ostrow, *pro hac vice forthcoming*
Jason H. Alperstein, *pro hac vice forthcoming*
200 S.W. 1st Avenue, 12th Floor
Fort Lauderdale, Florida 33301

Tel:   (954) 525-4100
Fax:   (954) 525-4300
ostrow@KOlawyers.com
alperstein@KOlawyers.com